52 N.J. Super. 583 (1958)
146 A.2d 527
CAMP CLEARWATER, INC., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
PETER PLOCK, MILDRED D. WILSON, GEORGE WILSON, JR., LAKE ILIFF COMMUNITY CLUB, A N.J. CORPORATION, DIETRICK TWIEFFEL, HEDWIG TWIEFFEL, RICHARD TWIEFFEL, CHARLES J. SPERL, EDITH SPERL, AND JOHN A. DESSEL, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided November 21, 1958.
*588 Messrs. Mackerley & Friedman, attorneys for plaintiff (Mr. Peter Friedman and Mr. William J. McGovern, appearing).
Messrs. Dolan & Dolan, attorneys for defendant Mildred D. Wilson (Mr. John T. Madden, appearing).
Messrs. Morris, Downing & Sherred, attorneys for defendant George Wilson, Jr. (Mr. Willis H. Sherred, appearing).
*589 KOLOVSKY, J.S.C.
At issue in this litigation are the rights of the parties to the use of the waters of a small natural lake or pond situate in Andover Township, Sussex County, now known as Clearwater Lake, but which, at times in the past, bore the more prosaic names of Lake Iliff, Iliff's Pond, and Hall's Pond.
Plaintiff, Camp Clearwater, Inc., claiming to be the owner in fee simple of the bed of the lake, instituted this action against nine individuals and Lake Iliff Community Club, a corporation, to enjoin them from using the lake, to obtain a declaration of the rights of the parties, and to recover damages for alleged trespasses on the lake.
During the course of the trial a settlement agreement was entered into between plaintiff and all the defendants except the defendants George Wilson, Jr., and Mildred D. Wilson.
Defendant George Wilson, Jr., who, with his wife Edith, owns two lots shown as Lots 2 and 3 in Section A on the filed map hereinafter referred to, admits that plaintiff is the owner of the bed of the lake, but claims that by virtue of prior grants and covenants such ownership is subject to an easement which gives him (George Wilson), as the owner of Lots 2 and 3, the right to maintain a dock or open summer house extending not more than 20 feet into the lake and the right to use and enjoy the waters of the lake for boating, fishing and bathing.
Defendant Mildred D. Wilson, who owns Lots 5, 6, and 7 in Section A on the filed map, contends that plaintiff has not established that it has title to the bed of the lake, and that in any event she has "the right to use the waters of the lake and to maintain a dock and bait trap therein, and the right to rent out boats to members of the public generally for purposes of boating, fishing, and swimming in the waters of the lake." She argues that the proofs show that those rights exist by reason of (1) a public easement, (2) an implied easement by prescription which she has acquired, and (3) equitable estoppel.
I find that the proofs do establish that plaintiff holds title to the bed of the lake.
*590 The lake, irregularly oval in shape, extends approximately 2400 feet from east to west and 750 feet from north to south. Many years ago the bed of the lake was divided among, and included in the description of, four separate tracts, which for convenience are hereinafter called Tracts A, B, C, and D.
Tract A, containing 102.8 acres, lies generally west of the lake and includes the westerly tip thereof.
Tract B, containing 2.5 acres, most of which is covered by the waters of the lake, is at the northeasterly end thereof.
Tract C, containing approximately 108 acres, extended northerly from a southerly boundary line which ran from east to west through approximately the center of the lake. Tract C thus included the northerly half of the bed of the lake except for those portions thereof as were encompassed in Tracts A and B.
Tract D, containing approximately 218 acres, included the southerly half of the lake and extended generally southerly from the line which split the lake and formed the southerly boundary of Tract C, to which Tract D was contiguous.
On April 1, 1902 The United Ice Companies of Trenton, N.J., a New Jersey corporation, held title to both Tracts C and D, and was thus the owner of the entire bed of the lake other than those portions included within Tracts A and B. It had acquired Tract C by deed dated March 30, 1901 from Henry M. Goble, executor of the last will and testament of George O. Onstead, who had purchased the tract in October 1864. By deed dated April 1, 1902 it acquired Tract D from Henry Harden and his wife; Harden having acquired Tract D in 1887.
By deed of the same date, April 1, 1902, The United Ice Companies of Trenton, N.J., conveyed to Nathan H. Hart and Lewis S. Iliff all of Tract D, except the portion thereof covered by the waters of the lake. The deed description was the same as that set out in the Harden deed, but by its terms the deed to Hart and Iliff expressly excepted and reserved to the grantor "from and out of the lands above *591 described all and every part thereof covered by the waters of the pond or lake known as Iliff Pond at high water mark."
The United Ice Companies of Trenton, N.J., continued to be the owner of Tract C, expanded to include the southerly portion of the lake, until August 1, 1925, when by deed of that date it conveyed the property to Charles S. Orben, taking back a purchase money mortgage of $9,000. The description in the deed and mortgage substituted a new metes and bounds description for the description contained in the prior chain of title.
At the time of the last mentioned conveyance Orben was the owner of so much of Tract D as was not included within the bed of the lake, having acquired title thereto by deed dated July 28, 1925, from Wesley Tidey and wife. The Tidey deed description was the same as that contained in the deed of April 1, 1902, to Hart and Iliff hereinbefore referred to.
By the same description, these two parcels of land were conveyed by Orben to Walter E. Fenner by deed of May 24, 1926, by Fenner to Richelieu Company by deed of November 22, 1926, and by Richelieu Company to Lake Iliff, Inc., by deed dated May 6, 1927.
On July 29, 1933 The Broad Street National Bank of Trenton, to which The United Ice Companies of Trenton, N.J., had assigned the purchase money mortgage of $9,000 made by Charles S. Orben under date of August 1, 1925, instituted foreclosure proceedings, a lis pendens being filed on August 4, 1933. The bank was the purchaser at the foreclosure sale, receiving a sheriff's deed dated June 21, 1934, in which the premises were described as they had been in the mortgage and included the entire bed of the lake other than the two portions thereof forming part of Tracts A and B.
That description was also used in all subsequent deeds and title documents, viz., the deed dated April 3, 1939, from the bank to the German-American Bund Auxiliary; the vesting order dated November 6, 1943, and recorded January 15, 1944, by which, pursuant to the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 1 et seq., and executive orders issued pursuant thereto, the Alien Property Custodian *592 vested the property in himself "subject to recorded liens, encumbrances, and other rights of record held by or for persons who are not nationals of designated enemy countries, to be held, used, administered, liquidated, sold or otherwise dealt with in the interest, and for the benefit of the United States"; the deed dated May 7, 1945, from the Alien Property Custodian to Frank Bucino, and the deed dated May 26, 1945, from Bucino and his wife to the plaintiff Camp Clearwater, Inc.
Omitted from the discussion to this point has been the chain of title to Tracts A and B in which lie the westerly end of the bed of the lake and slightly less than 2.5 acres of the northeasterly portion thereof. A detailed discussion of that chain of title is unnecessary. It is sufficient to note that title to both tracts vested in the German-American Bund Auxiliary by deed dated April 16, 1937, from Nellie I. Morrison (sole heir of William Iliff) and her husband, and that title thereto, as well as, as has been noted, title to the remainder of the bed of the lake which the Bund Auxiliary had obtained from The Broad Street National Bank, then passed successively to the Alien Property Custodian, Frank Bucino, and the plaintiff by the vesting order and deeds referred to in the preceding paragraph.
That record title to the bed of the lake is in plaintiff clearly has been established.
Before leaving this phase of the case, consideration should be given to the objection made by counsel for Mildred D. Wilson to the admission into evidence of various documents in the chain of title, an objection grounded on plaintiff's having failed to list those documents in its answer to an interrogatory demanding that the plaintiff "set forth the chain of title of all documents under which plaintiff claims the right to ownership of the lands under the waters of the lake known as Clearwater Lake."
The answer given set forth some 13 deeds in the chain of title, giving dates thereof, the parties thereto, and the books and pages in which they were recorded.
*593 Although plaintiff should have set forth in its answer all the documents that were offered into evidence, its failure to do so did not, in fact, prejudice the defendant. All the instruments offered are of record in the Office of the Clerk of Sussex County; most, if not all of them, are referred to in the various instruments which were set forth in the answer to the interrogatory. There is no suggestion that the failure to list all the documents was motivated by an intent to deceive; and moreover, during the course of the trial the court offered to afford additional time to the defendant to analyze and investigate the instruments offered if defendant conceived that she was surprised or prejudiced. All the documents admitted into evidence are properly to be considered as evidence against her, as well as against defendant George Wilson, Jr. Ross v. Ross, 35 N.J. Super. 242 (Ch. Div. 1955).
The lots owned by the defendants are lots shown on a map entitled, "Map of Lake Iliff," dated May 6, 1927 and filed in the Sussex County Clerk's Office by Lake Iliff, Inc., which at the time owned all of Tracts C and D. The map showed all the property owned by Lake Iliff, Inc., and included all the lake except the westerly end thereof and the 2 1/2 acres forming the northeasterly part thereof.
However, the filed map showed only two portions of the property actually subdivided and laid out into streets and building lots (most with a frontage of 50 feet); apparently the balance of the two tracts was left for future development and subdivision. Both subdivided portions, designated as Sections A and B, are south of the Andover-Newton-Sparta Road, which itself is south of the lake, although it borders on the southwestern shore of the lake for a distance of some 590 feet.
Defendant George Wilson, Jr., whose title (as tenant by the entirety with his wife) to Lots 2 and 3 in Section A stems from a deed dated August 15, 1929 from Lake Iliff, Inc., to George Wilson, Sr., bottoms his claim that he has the right to use all the lake, except the westerly end and the northeasterly 2 1/2 acres thereof which came through *594 separate chains of title, on two alleged easement grants in the chain of title to his property.
The first is found in the deed of April 1, 1902 by which The United Ice Companies of Trenton, N.J., conveyed to Nathan Hart and Lewis S. Iliff the portion of the 218-acre tract (Tract D) lying south of the lake, retaining title to the 108-acre tract (Tract C) as expanded to include most of the bed of the lake. That deed provided that the grantees, their heirs and assigns
"shall and may have and enjoy the right and privilege of boating and fishing in and upon said lake at all seasons of the year except during the winter months; said right and privilege to extend to the families of said parties of the second part, or their assigns, and casual visitors thereto."
But the easement and rights granted by that deed were extinguished when Charles S. Orben, who by deed dated July 28, 1925 had acquired Tract D, the dominant estate, then by deed dated August 1, 1925 from The United Ice Companies of Trenton, N.J., took title to Tract C, the servient estate, including all the bed of the lake other than that lying within Tracts A and B.
The merger of title to both the dominant and servient estates in Orben extinguished the easements and rights granted by the deed to Hart and Iliff; all Orben's rights to use the lake were thereafter referable to his ownership of the lake, not to his ownership of the easement. The easement ceased to exist, and since no question of easement by necessity is involved, it was not revived by the later severance of the united titles into the former dominant and former servient tenements. American Law of Property, §§ 8.88 and 8.91; Denton v. Leddell, 23 N.J. Eq. 64 (Ch. 1872); affirmed 24 N.J. Eq. 567 (E. & A. 1874); Fetters v. Humphreys, 19 N.J. Eq. 471 (Ch. 1868); Leasehold Estates, Inc. v. Fulbro Holding Co., 47 N.J. Super. 534, 560 (App. Div. 1957).
Even if the easement and rights granted to Hart and Iliff had not been so extinguished, they would not have passed to grantees of the lots into which portions of the *595 Hart and Iliff tract were subdivided. The severance of that tract into many parcels and to many owners would not carry the easements to each of them. Fidelity Union Trust Co. v. Cochrane, 116 N.J. Eq. 190, 193 (Ch. 1934).
The second alleged easement grant on which defendant, George Wilson, Jr., bases his claim is that which, he contends, is found in the deed to Lots 2 and 3 in Section A from Lake Iliff, Inc., to his father, George Wilson, dated August 15, 1929. That deed after describing the premises by lot numbers continues:
"The lands above described are conveyed subject to the following restrictions:
FIRST: The property in question shall be used for residence purposes only, that not more than one single family dwelling shall be erected on each lot, except that a one car garage may be erected on each lot in addition to the single family dwelling, and that no building of the style generally known in the building trade as a `flat roof house' shall be erected on the premises.
SECOND: No part of the body of any house (exclusive of porches) or the body of any other building shall be nearer the street line than thirty (30) feet (excepting that on lake front lots dock or open summer house may be built on the water front, but shall not extend over twenty feet outside the shore line). Also that no part of any building shall be nearer than five (5) feet to either side line of the lot on which it is built. This restriction may be varied from on written consent of the grantor in cases where a lot is less than one hundred feet in depth.
THIRD: Nothing in this deed shall in anywise be construed as limiting, prohibiting or restricting the grantor from imposing restrictions other than those hereinabove set forth, and the grantor herein reserves for itself the right and privilege to change or modify said restrictions at any time, when changes are found necessary for the benefit of the purchasers.
FOURTH: The grantee herein is given the privilege of using and enjoying Lake Iliff for boating, fishing, and bathing in accordance with the rules and regulations to be hereafter promulgated in writing by the party of the first part for the benefit of purchasers.
FIFTH: No nuisance or anything abnoxious or detrimental to adjoining or adjacent property shall be maintained on any part of the property.
SIXTH: The grantee shall provide sanitary disposal for all sewage, garbage and rubbish.
These restrictions run with the land and shall continue in full force and virtue until July 1st, 1942, when they shall cease and terminate."
*596 Defendant George Wilson, Jr., argues that the quoted paragraph Second created an easement appurtenant to Lots 2 and 3 which authorizes the construction and maintenance of a dock or open summer house extending not over 20 feet into the lake from a point across the public road from Lots 2 and 3, and that quoted paragraph Fourth created easements or rights appurtenant to those lots which gives the owner thereof the right and privilege of using and enjoying the lake for boating, fishing and bathing, and that those easements and rights still exist.
The deed is hardly a model of draftsmanship. The inference to be drawn is that the "restrictions" were drafted so that they might be incorporated without change in all deeds to be delivered by Lake Iliff, Inc., for lots which it hoped to sell in its lake colony, not only in the sections already laid out into lots but also in the remaining sections, those contiguous to the lake as well as to the north thereof left for future subdivision.
Although the quoted portion of the deed purports to list six restrictions, in fact, only the First, Second, Third, and Fifth paragraphs actually restrict the use of the land conveyed.
The Fourth paragraph, by its terms, is a grant of rights in the lake and such, in my opinion, is its effect.
The fact that the grant is set out under a heading purporting to list restrictions is of little moment.
"The primary rule of construction is that the intent of the conveyor is normally determined by the language of the conveyance read as an entirety and in the light of the surrounding circumstances." Hammett v. Rosensohn, 26 N.J. 415, 423 (1958).
"Whether a deed creates an easement is to be determined by ascertaining the intention of the parties as gathered from the language of the instrument * * *." 17 Am. Jur., Easements, § 30, p. 640.
"No particular words are necessary to constitute a grant, and any words which clearly show the intention to give an easement * * * are sufficient to effect that purpose, provided the language is certain and definite in its terms." 28 C.J.S. Easements § 24, p. 677.
Tested by these settled rules, it is clear that a grant of fishing, boating, and bathing rights was given by the *597 deed. But under the same settled rules of construction there is no justification for defendant George Wilson, Jr.'s claim that paragraph Second of the quoted restrictions, imposing building set-back and side-yard restrictions, constitutes a grant of a right to erect a dock or open summer house extending not more than 20 feet into the lake. Paragraph Second is a restriction on the use of the land granted; it does not purport to be, nor is it, a grant of additional lands or of rights therein.
Whether the boating, fishing and bathing rights granted by the deed be considered pure easements or a profit a prendre (See Albright v. Sussex County Lake & Park Commission, 71 N.J.L. 303 (E. & A. 1904); Mitchell v. D'Olier, 68 N.J.L. 375 (E. & A. 1902); Upper Greenwood Lake, etc., Ass'n. v. Grozing, 6 N.J. Super. 538 (Ch. Div. 1949)), it is evident from a reading of the language of the deed in the light of the surrounding circumstances that the rights were granted to George Wilson, Sr., not in gross, but as an appurtenance of Lots 2 and 3. Mitchell v. D'Olier, supra; Upper Greenwood Lake, etc., Ass'n. v. Grozing, supra. As such, those rights, unless they otherwise have been terminated or extinguished, passed under the deeds of conveyance which have vested title to Lots 2 and 3 in defendant George Wilson, Jr., and his wife, even though not specifically mentioned in those deeds. Mitchell v. D'Olier, supra.
However, plaintiff contends that even if the deed did grant rights to use the lake for boating, fishing and bathing those rights no longer exist and, in any event, cannot be asserted against it.
So, plaintiff says, if any rights were granted, they terminated on July 1, 1942 by virtue of the last paragraph of the "restrictions" reading as follows:
"These restrictions run with the land and shall continue in full force and virtue until July 1st, 1942, when they shall cease and terminate."
I cannot agree. That paragraph refers to the provisions which in fact restrict the use of the land conveyed. There *598 is no justification for construing it as terminating lake rights granted to a purchaser of property in a summer lake colony which obviously was intended to exist for more than ten years.
Plaintiff also argues that it had no notice of George Wilson's alleged rights to the use of the lake; that the recorded deed from Lake Iliff, Inc., to George Wilson was not in plaintiff's chain of title, so that plaintiff was not charged with notice of that deed and therefore took title to the lake free from the rights to the use of the lake allegedly granted by that deed.
It is true that in this State the provisions of the Recording Act (R.S. 46:21-1 et seq.) are deemed not to charge a purchaser of lands with constructive notice of easements or covenants affecting his lands which appear in an earlier deed by his grantor, conveying property other than the property involved in the purchaser's chain of title. Glorieux v. Lighthipe, 88 N.J.L. 199 (E. & A. 1915); Gilpin v. Jacob Ellis Realties, Inc., 47 N.J. Super. 26, 30 (App. Div. 1957); Hammett v. Rosensohn, 46 N.J. Super. 527, 535 (App. Div. 1957), affirmed 26 N.J. 415 (1958); National Silk Dyeing Co. v. Grobart, 117 N.J. Eq. 156 (Ch. 1934); cf. 5 Tiffany, Real Property, § 1266; American Law of Real Property, § 17.24; Annotation, 16 A.L.R. 1013.
Having said that, however, is not to dispose of the question, for notice of the existence of an easement affecting his property may be chargeable to a purchaser by means other than the recording statute  for example, by notice from a physical inspection of the property or from recital in a deed in his chain of title. National Silk Dyeing Co. v. Grobart, supra; Higbee Fishing Club v. Atlantic City Elec. Co., 78 N.J. Eq. 434 (Ch. 1911); William Dahm Realty Corp. v. Cardel, 128 N.J. Eq. 222 (Ch. 1940).
A purchaser is "chargeable with notice of every matter affecting the estate, which appears on the face of any deed forming an essential link in the chain of instruments through which he derived his title, and also with notice of whatever matters he would have learned by any inquiry which the recitals in these instruments made it his *599 duty to pursue." Roll v. Rea, 50 N.J.L. 264, 268 (Sup. Ct. 1888); Mitchell v. D'Olier, 68 N.J.L. 375 (E. & A. 1902); 5 Tiffany, Real Property, § 1293.
Plaintiff is charged with such notice by the recital contained in every deed in its chain of title beginning with the deed dated April 3, 1939, from the Broad Street National Bank of Trenton to the German-American Bund Auxiliary, the recital reading as follows:
"The aforesaid premises are conveyed subject to * * * such boating, fishing and bathing rights in and on Lake Iliff as may be outstanding by virtue of prior grants and use."
By this recital plaintiff had sufficient notice to put it on inquiry and inquiry would have led it to examine the record of the deed from Lake Iliff, Inc., to George Wilson.
Finally, quoting the following from Boylan v. Loy Corp., 128 N.J. Eq. 460, 462 (Ch. 1941), affirmed o.b. 130 N.J. Eq. 203 (E. & A. 1941):
"A person acquiring title through the foreclosure of a mortgage is regarded as a purchaser from the date of the mortgage and not from the date of his deed,"
plaintiff argues that when its predecessor in title, Broad Street National Bank of Trenton, acquired title at the sheriff's sale in the proceedings by which it foreclosed its mortgage, it acquired title to the property in the status in which it was at the time the mortgage was made, free from the alleged easement thereafter created.
Plaintiff misconceives the holding of the cited case. The foreclosure of a mortgage vests in the purchaser at the foreclosure sale a legal right to the property free of easements and encumbrances imposed upon it subsequent to the mortgage provided that the holders of such easement rights or encumbrances are made parties to the foreclosure. Atlantic City National Bank v. Wilson, 108 N.J. Eq. 213 (E. & A. 1930); Krich v. Zemel, 99 N.J.L. 191 (E. & A. *600 1923); Norfolk Building & Loan Assn. v. Stern, 113 N.J. Eq. 385 (Ch. 1933), affirmed 115 N.J. Eq. 282 (E. & A. 1933).
If the holder of such easement right or encumbrance is not made a party, his rights are not cut off by the foreclosure sale (Atlantic City National Bank v. Wilson, supra; Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403 (E. & A. 1938)), unless the instrument creating his right or lien was not recorded and could have been (N.J.S. 2A:50-30, formerly C.S. 1910, p. 432, Chancery Act § 58; Marcy v. Larkin, 99 N.J. Eq. 429 (E. & A. 1926); Walter v. Introcaso, 135 N.J.L. 461 (E. & A. 1947)).
When, on July 29, 1933, The Broad Street National Bank of Trenton instituted proceedings to foreclose its mortgage, it joined as parties defendant thereto not only Lake Iliff, Inc., the owner of the mortgaged premises, but also Orben, the original mortgagor, and intervening grantees, as well as several subsequent lienors. But it did not join George Wilson, although the deed from Lake Iliff, Inc., to him was of record.
It is evident, not only from the allegations of the bill to foreclose but also from the recitals in the later deed from the bank to the Bund Auxiliary above referred to, that the bank had or was chargeable with notice sufficient to put it on inquiry as to the rights of Lake Iliff, Inc.'s grantee, George Wilson, even though his deed was not in the chain of title of the mortgaged premises.
The bill to foreclose alleged that Lake Iliff, Inc., owned the mortgaged premises and that Lake Iliff, Inc., by deed from Richelieu Company had also become the owner of the tract of land adjoining the lake on the south and then charged that
"any right or privilege of using and enjoying Lake Iliff for boating, fishing, and bathing which said Lake Iliff, Inc., may have or claim to own by reason of said ownership of said adjoining tract or otherwise is subject to the lien of complainant's mortgage." *601 Despite the knowledge disclosed in this allegation, the bank made no effort to join any of Lake Iliff, Inc.'s grantees as parties defendant to the foreclosure.
The rights granted by the deed of August 15, 1929 to George Wilson, Sr., were not cut off by the foreclosure since he was not joined as a party thereto. Those rights continue to exist as an appurtenance of Lots 2 and 3 in Section A now owned by defendant George Wilson, Jr., and his wife, and give them the privilege of using and enjoying the waters of the lake, except for the westerly end and the northeasterly 2 1/2 acres thereof (Baker v. Normanoch Ass'n., Inc., 25 N.J. 407, 419 (1957)), for boating, fishing and bathing.
By the terms of the grant, that privilege is not exclusive and is to be exercised "in accordance with the rules and regulations to be hereafter promulgated in writing by the party of the first part (Lake Iliff, Inc.) for the benefit of the purchasers." The wisdom of the insertion of such a provision where non-exclusive rights to the use of the lake were to be granted to numbers of people is apparent.
There has been no showing that Lake Iliff, Inc., ever promulgated such written rules and regulations. In any event, however, under the circumstances shown and in view of the language of the grant, the power to promulgate those rules and regulations is now vested in plaintiff as the owner of the bed of the lake.
If such written rules and regulations are promulgated, they must be just and reasonable and must apply uniformly to all persons having the right to use the waters of the lake for fishing, boating and bathing. Belmar v. Prior, 81 N.J.L. 254 (Sup. Ct. 1911); see also 51 C.J.S. Landlord and Tenant § 337, p. 1023.
The title now held by defendant Mildred D. Wilson to Lots 5, 6, and 7 in Section A stems from three deeds executed by Hopatcong Hills, Inc., to which Lake Iliff, Inc., conveyed its two tracts subsequent to the filing of the lis pendens in the foreclosure proceeding above mentioned. The first deed, dated June 29, 1936, conveyed Lot 5 to Helen Wilson, later defendant's mother-in-law; the second and third, dated *602 respectively November 21, 1947 and December 13, 1954, conveyed Lots 6 and 7 to Mildred D. Wilson and her late husband, William E. Wilson. No lake rights were or could have been granted by those deeds, for Hopatcong Hills, Inc., then had no title or interest in the lake; the title which it had had was extinguished by the foreclosure sale.
Arguing that Baker v. Normanoch Ass'n., Inc., 25 N.J. 407 (1957), is distinguishable, defendant Mildred D. Wilson contends that the evidence establishes that the public has acquired, by adverse possession or prescription, the right to use the waters of the lake and that she as a member of the public is entitled to exercise such right.
The law of this State is settled to the contrary; the general public have no rights to the recreational use of a private lake, such rights being exclusive in the owner of the bed. Baker v. Normanoch Ass'n., Inc., supra.
Nor can the public acquire such rights by prescription. Baker v. Normanoch Ass'n., Inc., 25 N.J. 407 (1957); Albright v. Cortright, 64 N.J.L. 330 (E. & A. 1899); 28 C.J.S. Easements § 8, p. 643; cf. Soper v. Conly, 108 N.J. Eq. 370 (Ch. 1929), affirmed 107 N.J. Eq. 537 (E. & A. 1930).
Moreover, the evidence does not establish that the public user was adverse or hostile rather than permissive. On the contrary, it shows that the lake was an open lake, used at will by members of the public, many of whom came from other areas of Sussex County, for fishing, boating, swimming, occasional ice fishing, and hunting on the adjacent shores. There is no showing that the owners of the lake interfered with or even protested such public use, at least not until 1951 when plaintiff served a notice on the defendant Mildred D. Wilson objecting to her use of the lake. What appears is a permissive use by the public. Baker v. Normanoch Ass'n., Inc., supra; Cobb v. Davenport, 32 N.J.L. 369 (Sup. Ct. 1867). Defendant suggests that a right to public use of the lake may exist because since 1922 the lake has been stocked with fish by the Division of Fish and Game of the State of New Jersey. The identical suggestion was *603 repudiated almost 60 years ago in an action involving another Sussex County lake. Albright v. Cortright, supra.
Finally, although the public may acquire rights in a private lake by dedication, Baker v. Normanoch Ass'n., Inc., supra, 25 N.J. at page 416, there is no proof that any owner in the chain of title to the lake indicated an intent to dedicate it to public use.
Nor does the evidence and the applicable law support Mildred D. Wilson's assertion that the several distinct rights to use the lake which she claims have been created by prescription as an easement or easements appurtenant to Lots 5, 6, and 7.
"The nature of the user necessary for the creation of an easement by prescription is the same as that for the acquisition of title by adverse possession, i.e., it must be adverse or hostile, exclusive, continuous, uninterrupted, visible and notorious for a period of 20 years. * * *" Baker v. Normanoch Assn., Inc., 25 N.J. 407, 419 (1957).
Leaving aside any consideration of whether defendant Mildred D. Wilson has proven the other necessary elements of such user, and indeed, whether her claimed right to conduct a boat renting business can be created by prescription, the allegedly adverse user on which she relies has not been continuous and uninterrupted for a period of 20 years.
As for the claimed right to maintain a bait trap, a wooden float moored in the lake and "built on empty metal barrels with a device underneath for the catching of bait," the earliest date of user on which defendant can possibly rely is in 1941, when allegedly her husband and her mother-in-law began to maintain and use it. The alleged prior maintenance and use of the bait trap by one Elmer Walker, who, it is claimed, constructed the bait trap in 1935, cannot benefit defendant or be tacked on defendant's alleged period of possession, since there was no privity of title between her and Walker; he never owned or had any interest in the lots now owned by defendant. O'Brien v. Bilow, 121 N.J.L. 576 (E. & A. 1938).
*604 The earliest date of user on which defendant can rely for the other rights claimed is June 29, 1936, when Helen Wilson took title to Lot 5. Such user is not even referable to Lots 6 and 7 which were not acquired until 1947.
Moreover, whatever the beginning dates thereof, such users had continued for less than nine years when, by vesting order dated November 6, 1943, the Alien Property Custodian seized and took title on behalf of and for the benefit of the United States to the property then owned by the German-American Bund Auxiliary and now owned by plaintiff.
It is settled law that the United States, under the war power, may confiscate enemy property or vest in itself the property of a national of an enemy nation. Silesian American Corporation v. Clark, Attorney General, etc., 332 U.S. 469, 68 S.Ct. 179, 92 L.Ed. 81 (1947); that on such seizure by the Alien Property Custodian the United States becomes the owner of the property. 93 C.J.S. War & National Defense § 26(6), p. 79; United States v. Silliman, 65 F. Supp. (D.C.N.J. 1946); and that sale by the Alien Property Custodian in accordance with the statutory power vests absolute title in the purchaser. 93 C.J.S. War & National Defense § 26(6), p. 85; Gausebeck v. Pallante, 4 N.J. Super. 118 (App. Div. 1949).
No easement by prescription can be created in lands during the time the United States holds title thereto (Annotation, 55 A.L.R.2d 576); nor can title thereto be acquired by adverse possession. Annotation, 55 A.L.R.2d 563; 2 C.J.S. Adverse Possession § 12, p. 524; United States v. Silliman, supra.
"Since the United States is not subject to the jurisdiction of a state, the state is without power to prescribe the time within which the United States shall assert its rights in order to preserve them, and it must be regarded as settled that state statutes of limitation do not apply to the federal government; consequently, no title to public lands of the United States can be acquired by adverse possession or prescription during the time the United States holds title thereto, unless, of course, as is sometimes the case  (the situation does not exist here)  the United States consents to be bound by a limitation statute." Annotation 55 A.L.R.2d 563.
*605 Because the alleged user on which defendant Mildred D. Wilson relies continued for less than 20 years before title to the lake, the servient tenement, vested in the United States, the only period of user on which she can rely is the period, many years short of 20 years, which elapsed after May 7, 1945, when the Alien Property Custodian conveyed to Frank Bucino, plaintiff's predecessor in title; the period of user prior to title acquisition by the United States cannot be tacked on. Armstrong v. Morrill, 14 Wall. 120, 20 L.Ed. 765 (1872); Annotation, 50 A.L.R.2d 604.
Where there was a period of adverse possession prior to acquisition of title to the servient estate by the government "and another such period after the governmental entity had conveyed title out of itself, * * * courts have looked solely to the length of adverse holding after the government deed and denied the acquisition of prescriptive title where such a period was less than the applicable statute of limitations." Annotation, 50 A.L.R.2d 604.
As Mr. Justice Clifford, writing for the United States Supreme Court, said in Armstrong v. Morrill, supra, 14 Wall. 120, at 20 L.Ed. 772:
"Argument to show that the Statute of Limitations ceased to run when the forfeiture attached and the title became vested in the State can hardly be necessary, as the rule that time does not run against the State has been settled for centuries, and is supported by all courts in all civilized countries. Ang. Lim., 5th ed., 28. Suppose that is so, still it is insisted that the two periods, that is, the period of adverse possession before the forfeiture and the period subsequent to the conveyance by the State to the plaintiff or those under whom he claims, may be added together and considered as one entire period, for the purpose of maintaining the defense * * *. But the proposition cannot be admitted, as it is well settled law that the possession, in order that it may bar the recovery, must be continuous and uninterrupted as well as open, notorious, actual, exclusive and adverse. * * *
* * * forfeiture to the State within the period necessary to give effect to the statute did have the effect to break the continuity of adverse possession, and prevented the operation of the statute bar. * * *."
The last ground urged by Mildred D. Wilson for her claimed easement is that it was allegedly created through *606 estoppel in pais. See N.J. Suburban Water Co. v. Harrison, 122 N.J.L. 189 (E. & A. 1938); West Jersey Title, etc., Co. v. Industrial Trust Co., 27 N.J. 144, 153 (1958); Sanders v. Reid, 131 N.J. Eq. 407 (Ch. 1942); Upper Greenwood Lake, etc., Ass'n. v. Grozing, 6 N.J. Super. 538 (Ch. Div. 1949).
Defendant "cannot establish [her claimed] interest in [defendant's] real property through an estoppel in pais, unless she clearly and convincingly makes out the several elements of the estoppel." Weiland v. Turkelson, 38 N.J. Super. 239, 249 (App. Div. 1955).
The proofs submitted fall far short of meeting this test. At most, they show that plaintiff and its grantor, Bucino, made no objection to defendant's use of the lake during the period from 1945 to 1951; that plaintiff did not institute this action until 1957, and that on several occasions Bucino or his wife and some of their guests rented rowboats from defendant.
Defendant in no wise changed her position because of anything which plaintiff did or did not do. Nor did plaintiff violate any obligation which it owed to defendant. The proofs do not give rise to an equitable estoppel. Sanders v. Reid, 131 N.J. Eq. 407 (Ch. 1942); Weiland v. Turkelson, 38 N.J. Super. 239 (App. Div. 1955).
Although the complaint contained a prayer for damages, plaintiff has abandoned it.
A judgment may be submitted in accordance with the opinion. No costs will be allowed to any of the parties as against the others.